IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| PLAINTIFF, | |
| v. | CIVIL CASE NO.: |
| $70,272.83 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER ENDING 7642; $61,161.61 IN FUNDS SEIZED FROM JPMORGAN CHASE BANK ACCOUNT NUMBER ENDING 9283; $6,690.40 IN FUNDS SEIZED FROM CAPITAL ONE BANK ACCOUNT NUMBER ENDING 7615; $303.57 IN FUNDS SEIZED FROM CAPITAL ONE BANK ACCOUNT NUMBER ENDING 7763; $10,006.31 IN FUNDS SEIZED FROM MEMBERS FIRST CREDIT UNION ACCOUNT NUMBER ENDING 5795-001; $1,402.37 IN FUNDS SEIZED FROM MEMBERS FIRST CREDIT UNION ACCOUNT NUMBER ENDING 5795-035; $2,285.64 IN FUNDS SEIZED FROM AMERICAN AIRLINES CREDIT UNION ACCOUNT NUMBER ENDING 1725; $3,190.95 IN FUNDS SEIZED FROM JPMORGAN CHASE BANK ACCOUNT NUMBER ENDING 9833; AND $152.50 IN FUNDS SEIZED FROM JPMORGAN CHASE BANK ACCOUNT NUMBER ENDING 7298, | |
| DEFENDANTS. | |

## VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW Plaintiff United States of America, by Ryan K. Buchanan,

United States Attorney, and Norman L. Barnett, Assistant United States Attorney,

for the Northern District of Georgia, and shows the Court the following in support of its Verified Complaint for Forfeiture:

## NATURE OF THE ACTION

1.   This is a civil forfeiture action against over $155,000.00 seized from various bank accounts arising from a COVID-19 relief scheme involving the submission of fraudulent applications for Economic Injury Disaster Loans and Paycheck Protection Plan loans.

## DEFENDANTS IN REM

2.   The defendant property consists of the following funds that the United States Postal Inspection Service ("USPIS") seized, pursuant to Federal seizure warrants:

   a.   $70,272.83 in funds seized from Bank of America account number ending 7642, held in the name of Katrina Lawson ("BOA 7642") on or about May 3, 2021 ("Defendant $70,272.83");

   b.   $61,161.61 in funds seized from JPMorgan Chase Bank account number ending 9283, held in the name of Katrina Lawson ("JPMC 9283") on or about March 23, 2021 ("Defendant $61,161.61");

c. $6,690.40 in funds seized from Capital One Bank account number ending 7615, held in the name of Katrina Lawson ("COB 7615") on or about March 23, 2021 ("Defendant $6,690.40");

d. $303.57 in funds seized from Capital One Bank account number ending 7763, held in the name of Katrina Lawson ("COB 7763") on or about March 23, 2021 ("Defendant $303.57");

e. $10,006.31 in funds seized from Members First Credit Union account number ending 5795-001, held in the name of Katrina Lawson ("MFCU 5795-001") on or about April 6, 2021 ("Defendant $10,006.31");

f. $1,402.37 in funds seized from Members First Credit Union account number ending 5795-035, held in the name of Katrina Lawson ("MFCU 5795-035") on or about April 6, 2021 ("Defendant $1,402.37");

g. $2,285.64 in funds seized from American Airlines Credit Union account number ending 1725, held in the name of Katrina Lawson ("AACU 1725") on or about April 7, 2021 ("Defendant $2,285.64");

    h.  $3,190.95 in funds seized from JPMorgan Chase Bank account number ending 9833, held in the name of Katrina Lawson ("JPMC 9833") on or about April 2, 2021 ("Defendant 3,190.95");

    i.  $152.50 in funds seized from JPMorgan Chase Bank account number ending 7298, held in the name of Katrina Lawson ("JPMC 7298") on or about April 2, 2021 ("Defendant $152.50").

(collectively, the "Defendant Funds").

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.    This Court has *in rem* jurisdiction over the Defendant Funds pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district.

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395 because the property is located in this district.

6.    The Defendant Funds are presently located in a secure account maintained by the United States Marshals Service.

## BASIS FOR FORFEITURE

### Relevant Statutes

7.     The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that they constitute or were derived from proceeds traceable to a violation of 18 U.S.C. § 1349 (conspiracy to commit wire fraud).

8.     The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that they constitute or were derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (wire fraud).

9.     The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that they constitute or were derived from proceeds traceable to a violation of 18 U.S.C. § 1344 (bank fraud).

10.     The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering), or are property traceable to such property.

11.     The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property, real or personal,

involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957 (money laundering), or are property traceable to such property.

## Factual Background

### *The Small Business Administration*

12. The United States Small Business Administration ("SBA") is an executive branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

13. As part of this effort, the SBA enables and provides for loans through banks, credit unions, and other lenders. These loans are government-backed guarantees.

### *Economic Injury Disaster Loan (EIDL)*

14. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

15.     The provisions of the CARES Act, in conjunction with an officially declared disaster by the United States Government, allowed the Small Business Administration ("SBA") to offer Economic Injury Disaster Loan ("EIDL") funding to business owners negatively affected by COVID-19. Through the SBA online portal, EIDL applicants could submit personal and business information in support of each EIDL application, but they did not have to submit any supporting or substantiating documentation with their application.

16.     An EIDL application included a paragraph where the applicant affirms that the information submitted is true and correct under the penalty of perjury and other applicable criminal statutes. The application process involved filling out data fields relating to the size of the affected business entity, the ownership of the business, the number of employees working for the business, and gross business revenues realized in the 12 months prior to COVID-19's impact on the national economy. The business must have existed in an operational condition on or before February 1, 2020.

17.   The EIDL application information, submitted by the applicant, was then used by SBA systems to calculate the amount of money the business was eligible to receive in the form of a loan.

18.   EIDL applicants could also receive an EIDL Advance, funds up to $10,000.00, based upon the number of employees the applicant claims, having simply clicked on and checked a box within the online application. The EIDL Advance did not have to be repaid.

19.   The SBA Office of Disaster Assistance ("ODA"), headquartered in Washington, DC, was responsible for the EIDL program.  The ODA has authority over all loans created and disbursed under the EIDL program. EIDL principal proceeds and available Cash Advance Grants (up to $10,000) were solely funded by the SBA and disbursed from government-controlled accounts maintained with the U.S. Treasury at Federal Reserve Banks throughout the United States.

20.   Pursuant to the provisions governing the EIDL program, loan proceeds were required to be used on certain permissible business expenses.  The EIDL funds could be used by the afflicted business to pay fixed debts,

payroll, accounts payable, and other bills that could have been paid absent the impact of COVID-19.

21. As referenced above, applicants were not required to provide documents to the SBA. The SBA relied 100% on the truthfulness of an applicant's submission.

*The Paycheck Protection Program (PPP)*

22. Another source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses through a program referred to as the Paycheck Protection Program ("PPP"). To qualify for the PPP, a small business must have been in operation on or before February 15, 2020, and realized monthly payroll costs.

23. To obtain a PPP loan, a qualifying business must submit a PPP loan application, which must be signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the PPP loan application, a small business (through its authorized

representative) must state, among other things, its average monthly payroll expenses. This figure is used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation of their payroll expenses.

24. A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are guaranteed by the SBA.

25. PPP loan proceeds must be used by the business on certain permissible expenses, such as payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on permissible expense items within a designated period after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

*The EIDL Wire Fraud Scheme*

26. In or around July 2020, Federal law enforcement began investigating Katrina Lawson ("Lawson"), Alicia Quarterman ("Quarterman"), and other co-

conspirators regarding the submission of fraudulent applications for EIDL Advances.

27.   During all times relevant to this Complaint, Quarterman resided in the Northern District of Georgia.

28.   Lawson resided in Texas during all times relevant to this Complaint.

29.   The investigation revealed that Lawson and Quarterman conspired with several individuals to apply for multiple EIDLs on their behalf in exchange for the individuals paying a fee for the fraudulent applications.

30.   On or about July 1, 2020, Lawson sent a series of text messages from her cell phone to Quarterman outlining a scheme to obtain EIDL Advances.

31.   Lawson told Quarterman, "I got another money maker for us and I'll do your [sic] for free but get some people together and I'm charging $1000 per application."

32.   In additional text messages, Lawson explained to Quarterman that an EIDL Advance is a "grant" that did not have to be paid back.

33.   To provide more details about EIDL Advance, Lawson sent Quarterman a screenshot of the SBA EIDL website.

11

34.  Lawson told Quarterman, "we are going to charge $2000 for me to do the application, they will get 10,000 deposited in there [sic] account and they got to send me $2000 and I'll split it with you for every person you get."

35.  Quarterman agreed to the scheme.

36.  On or about July, 2020, Quarterman gave Lawson her information so that Lawson could submit a fraudulent EIDL application for Quarterman.

37.  Later that day, Lawson submitted a fraudulent EIDL application to the SBA on her own behalf and on behalf of Quarterman, requesting a $10,000.00 advance.

38.  Quarterman then began contacting multiple individuals, mostly via text message, telling them about the EIDL scheme, her "fee" for submitting fraudulent applications, and the personal information the individuals needed to submit to apply for a loan.

39.  Quarterman also told several of these individuals that they could recruit their friends or family to participate in the scheme.

40.  Once Quarterman obtained personal information from individuals wishing to submit a fraudulent EIDL application, Quarterman forwarded the information to Lawson via text message.

41.   When Lawson received the personal information, she completed and submitted online EIDL applications to the SBA by inputting false information for each applicant, including the existence of a business, how many employees worked for the business, and the income for the business.

42.   Once Lawson submitted the fraudulent applications, Lawson took a screenshot of the EIDL application number and sent it via text message to Quarterman.

43.   Quarterman would then send text messages to the individuals that provided personal information for the fraudulent loan applications.

44.   When the individuals received their money from their EIDL Advances, they paid Quarterman her "fee" from the EIDL Advance proceeds by cash, cashier's check, or mobile banking applications.

45.   Once Quarterman received her "fee," Quarterman and Lawson divided the funds between them, mostly through electronic banking.

46.   Overall, between July 1, 2020 and August 1, 2020, Quarterman sent Lawson information for at least 48 different individuals for the purpose of submitting fraudulent EIDL applications.

47.   Lawson completed and submitted approximately 58 fraudulent EIDL applications to the SBA.

48.   The SBA accepted and issued $185,500.00 on 19 fraudulent EIDL applications submitted by Lawson that used information given to Lawson by Quarterman.

*The PPP Wire Fraud Scheme*

49.   In or around July 2020, Lawson and Quarterman expanded their COVID-19 relief scheme to include PPP loans.

50.   On or about July 27, 2020, Lawson, via text message, told Quarterman,

> You can get up to 20,000 with the Paycheck protection Program. The Loans are 100% forgivable if you follow the PPP loan forgiveness requirements issued by the Small Business Administration (SBA). I will take care of the loan forgiveness document as well so you don't have to worry about that. The fee to do the loan is $6000, so you end up with $14000. The time frame use to be 3-4 business days but right now it's no set time for funds to be deposited into your account, but you will get it give or take 7-10 days. I will need to your February bank statement in order to proceed [sic].

51.   After working out the details of their newly devised PPP scheme with Lawson, Quarterman contacted many of the same individuals she originally

contacted for the EIDL scheme and told them about the PPP loan and the new information needed to apply.

52. Altogether, Quarterman sent information for at least 15 individuals, including her own information, to Lawson via text message for the purpose of submitting fraudulent PPP loan applications to the SBA.

53. As with the EIDL scheme, once Lawson received the personal information from Quarterman, Lawson completed and submitted online PPP application to lenders participating in the PPP by inputting false information for each applicant, including the existence of a business, how many employees worked for the business, and the income for the business.

54. On July 27, 2020, Lawson also submitted a fraudulent PPP loan to Cross River Bank using her name.

55. Lawson obtained a loan payment of $20,740.00 from the fraudulent PPP loan application.

56. Once the individuals who provided information received payments from the fraudulent PPP loan applications, they paid Quarterman a "fee" from the PPP proceeds in cash, cashier's checks, and mobile banking applications.

57.   Again, as with the fees Quarterman received through the EIDL scheme, Quarterman and Lawson split the fees using electronic banking.

58.   SBA partner banks initially approved 11 of the fraudulent PPP loans submitted by Lawson using information sent to her by Quarterman.

59.   These financial institutions paid out at least $124,276 on six of the loans, as the additional five PPP loan applications were ultimately denied.

*BOA 7642 Received Fraud Proceeds from the EIDL and PPP Loan Scheme*

60.   Lawson is the sole account holder of BOA 7642.

61.   The registered address for the account was Lawson's residence in Texas.

62.   On June 12, 2020, BOA 7642 had an account balance of $4,002.08.

63.   Between approximately July 7, 2020 and August 14, 2020, BOA 7642 received approximately $49,500.00 in transfers from individuals who provided information to Lawson and Quarterman for the fraudulent EIDL and PPP loan applications scheme.

64.   BOA 7642 also received approximately $29,100.00 in ATM deposits between July 20, 2020 and August 25, 2020.

65.   Upon information and belief, these transfers and deposits into BOA 7642 constituted Lawson's portion of the fees she and Quarterman received for

submitting fraudulent EIDL and PPP loan applications on behalf of several individuals because the funds were derived from cash deposits and transfers from bank accounts that received proceeds from fraudulent loan applications submitted by Lawson.

66. Additionally, on or about July 28, 2020, BOA 7642 received a $20,740.00 payment from a fraudulent PPP loan application that Lawson submitted using her own information.

67. On or about May 3, 2021, USPIS seized Defendant $70,272.83 from BOA 7642, pursuant to a Federal seizure warrant.

*JPMC 9283 Received Fraud Proceeds from the EIDL and PPP Loan Scheme*

68. Lawson opened JPMC 9283 on or about May 28, 2020.

69. Lawson was the sole account holder of JPMC 9283.

70. On or about July 1, 2020, JPMC 9283 had a balance of $1,738.17.

71. Between July 8, 2020 and August 31, 2020, JPMC 9283 received approximately $77,276.00 in deposits, which by information and belief, were derived from individuals that provided Lawson and Quarterman with personal information to obtain fraudulent EIDLs and PPP loans.  These deposits included Cash App payments, Zelle payments and ATM Deposits.

17

72.    Funds from JPMC 9283 were also involved in a money laundering transaction to purchase a 2019 Mercedes-Benz GLE 43 AMG.

73.    Specifically, on or about August 3, 2020, Lawson wrote a check for $35,000.00 to Mercedes-Benz of the Woodland as partial payment for the purchase of a 2019 Mercedes Benz GLE 43 AMG.

74.    On or about March 3, 2021, USPIS seized Defendant $61,161.61 from JPMC 9283, pursuant to a Federal seizure warrant.

*COB 7615 and COB 7763 Received Fraud Proceeds from the EIDL and PPP Scheme and the Proceeds were Involved in Money Laundering Transactions*

75.    Lawson is the sole account holder of COB 7615.

76.    On July 1, 2020, COB 7615's opening balance was $0.82.

77.    Between July 4, 2020 and August 7, 2020,  COB 7615 received approximately $21,000.00 in deposits that, by information and belief, constituted fees from individuals that provided Lawson and Quarterman with personal information used to submit fraudulent EIDL and PPP loan applications.

78.    Specifically, COB 7615 received the funds from bank accounts that received proceeds from fraudulent loan applications submitted by Lawson.

79.    COB 7763 is another account in which Lawson was the sole account holder.

80.    On July 1, 2020, COB 7763's opening balance was $0.30.

81. On July 6, 2020, $2,000.00 was transferred into COB 7763 from COB 7615 and, on July 7, 2020, $3,000.00 was transferred from COB 7615 to COB 7763.

82. On August 3, 2020, $5,000.00 was transferred from COB 7763 to COB 7615.

83. That same day, $6,500.00 was transferred from COB 7615 to COB 7763.

84. Moreover, on August 3, 2020, $1,200.00 was transferred from COB 7615 to 7763.

85. Shortly thereafter, on August 7, 2020, $6,000.00 was transferred from COB 7615 to COB 7763.

86. Later that day, $11,000.00 in cash was withdrawn from COB 7763.

87. Similarly, between August 12, 2020 and August 14, 2020, $8,000.00 was transferred from COB 7615 to COB 7763.

88. A few days later, $8,000.00 in cash was withdrawn from COB 7763 on August 17, 2020.

89. This circular flow of funds between accounts is consistent with money laundering because such transfers are conducted to obfuscate the source of funds.

90. On or about March 23, 2021, USPIS seized Defendant $6,690.40 from COB 7615, pursuant to a Federal seizure warrant.

19

91.    On or about March 23, 2021, USPIS seized Defendant $303.57 from COB

      7763, pursuant to a Federal seizure warrant.

*MFCU 5795-035 Received Fraud Proceeds from the EIDL and PPP Loan Scheme*

92.    Lawson opened MFCU 5795-035 on or about May 24, 2010.

93.    On July 1, 2020, MFCU 5795-035 had a balance of $0.52.

94.    Between July 1, 2020 and February 5, 2021, approximately $26,954.78 was

      deposited into MFCU 5795-035.

95.    By information and belief, these funds constituted Lawson's portion of fees

      that were paid to her by individuals who provided information for

      fraudulent loan applications as part of the EIDL and PPP loan scheme

      because the funds were derived from cash deposits and transfers to MFCU

      5795-035 from bank accounts that received proceeds from fraudulent loan

      applications submitted by Lawson.

96.    On or about April 6, 2021, USPIS seized Defendant $1,402.37 from MFCU

      5795-035, pursuant to a Federal seizure warrant.

*MFCU 5795-001 Received Fraud Proceeds from the EIDL and PPP Loan Scheme*

97.    Lawson opened MFCU 5795-001 on or about January 17, 2007.

98.    Between July 1, 2020 and February 5, 2021, MFCU 5795-001 had a balance of $5.61.

99.    MFCU 5795-001 received a wire for $5,000.00 on February 5, 2021 and a wire for $3,000.00 on February 8, 2021.

100.    The wires on February 5, 2021 and February 8, 2021 both originated from an individual that provided information to Quarterman and Lawson for fraudulent loan applications as part of the EIDL and PPP loan scheme.

101.    On March 19, 2021, MCFU 5795-035 transferred $10,000.00 to MFCU 5795-001.

102.    Notably, the March 19, 2021 transfer occurred the day after USPIS executed Federal seizure warrant for funds held in accounts controlled by Lawson.

103.    On or about April 6, 2021, USPIS seized Defendant $10,006.31 from MFCU 5795-001, pursuant to a Federal seizure warrant.

*AACU 1725 Received Fraud Proceeds from the EIDL and PPP Loan Scheme*

104.    Lawson opened AACU 1725 on or about August 2, 2015.

105.    On July 1, 2020, AACU 1725 had a balance of approximately $2,271.46.

106.    Between July 1, 2020 and August 31, 2020, AACU 1725 received cash deposits totaling approximately $43,476.43.

107.  The investigation revealed that many of these deposits originated from states throughout the United States and were in $1,000.00 increments.

108.  By information and belief, these funds constituted Lawson's portion of fees that were paid to her by individuals who provided information for fraudulent loan applications as part of the EIDL and PPP loan scheme because the funds were derived from cash deposits predominantly in $1,000.00 and $2,000.00 increments, which is consistent with the fees Lawson and Quarterman received as part of the scheme.

109.  On or about April 7, 2021, USPIS seized Defendant $2,285.64 from AACU 1725 pursuant to a Federal seizure warrant.

*JPMC 7298 and JPMC 9833 Received Fraud Proceeds from the EIDL and PPP Loan Scheme*

110.  Lawson opened JPMC 7298 and JPMC 9833 on July 6, 2020 as joined accounts.

111.  According to bank records, deposits into either account are reflected in the account balance for both accounts.

112.  On August 10, 2020, JPMC 7298 and JPMC 9833 received a deposit of $8,000.00.

113. Between February 2, 2021 and February 18, 2021, JPMC 7298 and JPMC 9833 received six deposits totaling $33,500.00.

114. By information and belief, these funds constituted Lawson's portion of fees that were paid to her by individuals who  provided information for fraudulent loan applications as part of the EIDL and PPP loan scheme because the funds were transferred from bank accounts that received proceeds from fraudulent loan applications submitted by Lawson.

115. On or about April 2, 2021, USPIS seized Defendant $3,190.95 from JPMC 9833, pursuant to a Federal seizure warrant.

116. On or about April 2, 2021, USPIS seized Defendant $152.50 from JPMC 7298, pursuant to a Federal seizure warrant.

*Lawson, Quarterman, and Their Co-Conspirators Were Convicted of Conduct Involving the EIDL and PPP Loan Scheme*

117. On April 20, 2021, the United States obtained a First Superseding Indictment charging Lawson, Quarterman, and others, with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, bank fraud, in violation of 18 U.S.C. §§ 1344 and 2, mail fraud, in violation of 18 U.S.C. §§ 341 and 2, and money laundering, in violation of

18 U.S.C. § 1957.[1] The First Superseding Indictment contained a forfeiture provision.

118.   On March 31, 2023, a trial jury in the Northern District of Georgia found Lawson guilty of conspiracy to commit wire fraud, wire fraud, bank fraud, mail fraud, and money laundering.[2]

119.   On February 14, 2024, the Court sentenced Lawson to 135 months of confinement.[3]

120.   The Court issued a Preliminary Order of Forfeiture ordering Lawson's interest in the following assets forfeited to the United States pursuant to 18 U.S.C. § 982(a):

   a.   2019 white Mercedes-Benz GLE coupe 43 AMG SUV with VIN 4JGED6EB2KA152202.

   b.   2020 black Suzuki GSX-R750 motorcycle with VIN JS1GR7MA7L7100828.

   c.   2014 grey Infiniti QX70 SUV with VIN JN8CS1MU7EM451179.[4]

---

[1] *See United States v. Lawson, et al.*, 3:21-cr-006-TCB-RGV (N.D. Ga.)(Doc. 126).
[2] *See id.*, (Doc. 407).
[3] *See id.*, (Doc. 463).
[4] *See id.*, (Doc. 462).

121.    The Court also imposed a forfeiture money judgment against Lawson in the amount of $2,279,664.00, pursuant to 18 U.S.C. § 982(a) and Federal Rule of Criminal Procedure 32.2(b)(2).[5]

122.    Prior to Lawson's jury trial, the United States notified the Court that it intended to pursue civil forfeiture of the Defendant Funds after the conclusion of the criminal action involving Lawson, and the United States pursues forfeiture of the Defendant Funds in this civil forfeiture action.[6]

123.    Prior to Lawson's trial, Quarterman and Lawson's other indicted co-conspirators pleaded guilty to charges arising from their involvement in the EIDL and PPP loan scheme.[7]

**FIRST CLAIM FOR FORFEITURE**
**18 U.S.C. § 981(a)(1)(C)**

124.    The United States re-alleges and incorporates by reference Paragraphs 1 through 123 of this Verified Complaint for Forfeiture as if fully set forth herein.

---

[5] *See id.,* (Doc. 462).

[6] *See id.,* (Doc. 392).

[7] *United States v. Lawson, et al.,* 3:21-cr-006-TCB-RGV (N.D. Ga.)(Docs. 286, 328, 337, 339, 341, 344, 355); *United States v. Montgomery*, 3:21-cr-00023-TCB (N.D. Ga.)(Doc. 2); *United States v. Middleton*, 3:22-cr-00008-TCB (N.D. Ga.)(Doc. 2).

125.   Based on the foregoing, the Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that the funds constitute or were derived from proceeds traceable to a violation of 18 U.S.C. § 1349 (conspiracy to commit wire fraud).

## SECOND CLAIM FOR FORFEITURE
## 18 U.S.C. § 981(a)(1)(C)

126.   The United States re-alleges and incorporates by reference Paragraphs 1 through 123 of this Verified Complaint for Forfeiture as if fully set forth herein.

127.   Based on the foregoing, the Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that the funds constitute or were derived from proceeds traceable to a violation of 18 U.S.C. § 1343 (wire fraud).

## THIRD CLAIM FOR FORFEITURE
## 18 U.S.C. § 981(a)(1)(C)

128.   The United States re-alleges and incorporates by reference Paragraphs 1 through 123 of this Verified Complaint for Forfeiture as if fully set forth herein.

129.  Based on the foregoing, the Defendant Funds are subject to forfeiture to the
      United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that the
      funds constitute or were derived from proceeds traceable to a violation of
      18 U.S.C. § 1343 (wire fraud).

**FOURTH CLAIM FOR FORFEITURE**
**18 U.S.C. § 981(a)(1)(A)**

130.  The United States re-alleges and incorporates by reference Paragraphs 1
      through 123 of this Verified Complaint for Forfeiture as if fully set forth
      herein.

131.  Based on the foregoing, the Defendant Funds are subject to forfeiture to the
      United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that the
      funds constitute property, real or personal, involved in a transaction or
      attempted transaction in violation of 18 U.S.C. § 1956 (money laundering),
      or are property traceable to such property.

**FIFTH CLAIM FOR FORFEITURE**
**18 U.S.C. § 981(a)(1)(A)**

132.  The United States re-alleges and incorporates by reference Paragraphs 1
      through 123 of this Verified Complaint for Forfeiture as if fully set forth
      herein.

133.   Based on the foregoing, the Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that the funds constitute property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957 (money laundering), or are property traceable to such property.

/

/

/

/

/

/

/

/

/

/

/

/

/

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

(1)    that the Court forfeit the Defendant Funds to the United States of America;

(2)    that the Court award Plaintiff the costs of this action; and

(3)    that Plaintiff have such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

This 16th day of July 2024.

Respectfully submitted,
RYAN K. BUCHANAN
    *United States Attorney*
    600 U.S. Courthouse
    75 Ted Turner Drive SW
    Atlanta, GA 30303
    (404) 581-6000   fax (404) 581-6181

/s/NORMAN L. BARNETT
    *Assistant United States Attorney*
    Georgia Bar No. 153292
    Norman.Barnett@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| PLAINTIFF, | |
| v. | CIVIL CASE NO.: |
| $70,272.83 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER ENDING 7642; $61,161.61 IN FUNDS SEIZED FROM JPMORGAN CHASE BANK ACCOUNT NUMBER ENDING 9283; $6,690.40 IN FUNDS SEIZED FROM CAPITAL ONE BANK ACCOUNT NUMBER ENDING 7615; $303.57 IN FUNDS SEIZED FROM CAPITAL ONE BANK ACCOUNT NUMBER ENDING 7763; $10,006.31 IN FUNDS SEIZED FROM MEMBERS FIRST CREDIT UNION ACCOUNT NUMBER ENDING 5795-001; $1,402.37 IN FUNDS SEIZED FROM MEMBERS FIRST CREDIT UNION ACCOUNT NUMBER ENDING 5795-035; $2,285.64 IN FUNDS SEIZED FROM AMERICAN AIRLINES CREDIT UNION ACCOUNT NUMBER ENDING 1725; $3,190.95 IN FUNDS SEIZED FROM JPMORGAN CHASE BANK ACCOUNT NUMBER ENDING 9833; AND $152.50 IN FUNDS SEIZED FROM JPMORGAN CHASE BANK ACCOUNT NUMBER ENDING 7298, | |
| DEFENDANTS. | |

## <u>VERIFICATION OF COMPLAINT FOR FORFEITURE</u>

I, Daryl Greenberg, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief

30

based upon my personal knowledge of the case and upon information obtained

from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that

the foregoing is true and correct.

This 16th day of July 2024.

DARYL GREENBERG
US POSTAL INSPECTOR
UNITED STATES POSTAL INSPECTION
SERVICE

31